## PETROLEUM RESOURCE DEVELOP-MENT CORPORATION, Petitioner,

v.

STATE of Oklahoma, ex rel. Bruce W. DAY, Administrator of the Department of Securities and the Oklahoma Securities Commission, Respondent.

No. 50618.

Supreme Court of Oklahoma.

Oct. 3, 1978.

David W. Jackson, Schuman, Milsten & Jackson, Tulsa, for petitioner.

Alvin L. Thomas, Gen. Counsel, Oklahoma Securities Commission, Oklahoma City, for respondent.

DOOLIN, Justice:

In this case petitioner Petroleum Resource Development Corporation, seeks to offer and sell units consisting of working interests in an oil and gas well. The sale is sought to be made without registration under the Oklahoma Securities Act 71 O.S. 1971 § 1 et seq. as amended 71 O.S.1977 Supp. (the Act), by virtue of the exemption afforded by 71 O.S.1977 Supp. § 401(b)(15)(A).

Petitioner is an Oklahoma Corporation engaged in the business of promoting oil and gas drilling ventures. In October of 1976, Petitioner began offering units of working interest in a proposed oil and gas well in Ellis County, Kansas. Initially petitioner used commissioned salesmen to promote sale of the units. The Administrator of the Oklahoma Department of Securities (Administrator) informed petitioner that payment of sales commissions without registration of the securities was violative of the Act.

Upon notification, petitioner discontinued payment of sales commissions and agreed to amend its offering in an attempt to comply with the directives of the Administrator. Petitioner's application to the Administrator for prospective claim to exemption was denied by the Administrator, affirmed by the Oklahoma Securities Commission (Commission), en banc. Petitioner seeks a rever-

sal by this court and a confirmation of its right to sell units in the future without registration under the Act.

In its sales prospectus, petitioner offers 32 units[1] of working interest at $1,981.38 per drilling and testing unit and an additional $2,140.52 per unit if the well is completed and equipped. The use of the proceeds of the sale of the units is shown as follows:

"(a) *Drilling:* If all units offered hereby are purchased, a total of $63,404.22 will be available. It is estimated that drilling and testing costs will total $28,280.00. The balance will be utilized as to meet any unexpected contingencies encountered in drilling. *Any surplus remaining will be retained by PETREDEC as a payment for leasehold selection and acquisition and drilling supervision.*

(b) *Completion:* If completion is attempted and all investors contribute their pro rata completion assessments, $68,-496.95 will be available to PETREDEC. Completion and equipping charges are presently estimated at $47,158.00. The balance will be used to meet any unexpected contingencies. *Any surplus will be retained by PETREDEC as an additional supervisory fee." (Emphasis supplied).*

Petitioner retains a 23.5% of the working interest although not obligated to contribute any capital to the venture (unless drilling or completion costs would exceed amount received from investors).

The offering summary reveals petitioner agrees to drill, and if appropriate complete and equip the well for an amount represented by the proceeds from the sale to the investors. Any amounts required in excess of this amount will be petitioner's obliga-tion, but *it will be free to retain any amounts not required for the above purposes with no duty to account to the investors.* No sales force will be employed. The units will be sold by petitioner's officers and employees. No commission will be paid these individuals in connection with their sales. Under this method it is possible for petitioner to realize a profit from the proceeds of the sale of the units even though commercial production is not obtained.

The order of the Commission found "that these proceeds retained by petitioner in excess of the direct and indirect costs allocated to the exploration project are in fact, a form of indirect remuneration for the solicitation of sales within the meaning of limitation two (2) of § 401(b)(15)(A) of the Act".

The Act requires certain non-exempt securities to be registered with the Administrator before they may be offered for sale to the public. In *State ex rel. Day v. Petco Oil & Gas, Inc.,* 558 P.2d 1163 (Okl.1977), we held that an investment package of undivided fractional interests in oil and gas leases coupled with an operating agreement constituted a security under the Act. Petitioner does not contest its package is a security as contemplated by this decision and 71 O.S.1977 Supp. § 2(20)(R).[2] The Oklahoma Legislature in 1976 (Session laws Ch. 89, p. 119) while amending the act to include oil and gas leases, also enacted exemptions for certain sales:

71 O.S.1977 Supp. § 401(b)(15)(A) provides:

"Any sale from or in this state to not more than thirty-two persons of a unit consisting of: interests in oil, gas or mining title(s) or lease(s) or any certificate of interest or participation, or conveyance in

---

1. Prospectus provides: "No *less* than one unit of working interest will be sold to any investor and fractional units will not be offered or sold." Thus there can never be in excess of 32 persons and there may be less.

2. 71 O.S.1971 Supp. § 2(20) provides: " 'Security' means any:

\* \* \* \* \* \*

(R) interest in oil, gas, or mineral leases, *except* that transactions involving leases or inter-est therein, between parties, each of whom is engaged in the business of exploring for or producing oil and gas or other valuable minerals as an ongoing business, and the execution of oil and gas leases by land, mineral, and royalty owners in favor of a party or parties engaged in the business of exploring for or producing oil and gas or other valuable minerals shall be deemed *not* to involve a security."

any form of an interest therein, or in payments out of production under such title(s) or lease(s), whether or not offered in conjunction with, or as an incident to, an operating agreement or other contract to drill oil or gas wells or otherwise exploit the minerals on the particular lease(s), whether or not the seller above or any purchasers are then present in the state, if

1. . . . .

2. No commission or *other remuneration* is paid or given *directly or indirectly* for the solicitation of any such sale excluding any commission or remuneration paid or given by and between parties each of whom is engaged in the business of exploring for or producing oil and gas or other valuable minerals. . . . " (Emphasis supplied).

Petitioner claims to be exempt under this section in that it no longer pays salespersons. Thus the objection of the Administrator has been corrected. Petitioner submits the surplus money it retains is not a commission but rather a "supervisory fee". Petitioner submits the limitation of § 401(b)(15)(A)(2) was created to restrict the availability of the exemption to offerings where no public solicitation was affected, by prohibiting the use of paid professional salesmen. Under this interpretation, the subsection simply prohibits a non-registered private offering in which salesmen are employed and take commissions. Petitioner further argues the interpretation implicit in Commission's order has the practical effect of regulating the fair price charged for the units. Cost to purchasers would necessarily be restricted to the actual cost. of production which is indefinite and speculative.

Commission counters this by stressing the clear meaning of the statute necessitates a finding the additional "supervisory fees" constitute a form of indirect remuneration, citing *State ex rel. Day v. Petco Oil & Gas, Inc., supra,* p. 1167 which states economic

realities of a transaction should control, not its form. Commission also calls our attention to *Schultz v. Rector-Phillips-Morse, Inc.,* 552 S.W.2d 4 (Ark.1977). That case involved, among other issues, whether the sale of investment units in an apartment complex was qualified for a registration exemption similar to the exemption of § 401(b)(15)(A)(2).[3] The Arkansas court held the interests were not exempt because the seller received, as a part of the purchase price of each unit, over $20,000.00 in cash for "consulting fees". This constituted both direct and indirect remuneration for solicitation and sale of the joint venture units, a violation of the Arkansas statute.

Although not controlling in the specialized field of oil and gas interests, this decision does lend support to Commission's argument. The Arkansas case only held the fee of $20,000.00, under the facts and circumstances of that case, was prohibited indirect remuneration.

We believe the Oklahoma Commission correctly analysed the situation. The Legislature specifically included *indirect remuneration* in the limitation, wisely foreseeing a possibility, such as present here, that a company might attempt to circumvent the limitation.

Petitioner claims because it is willing to disclose these amounts, the proscription is satisfied. Disclosure to potential investors may be laudatory but it does not cure failure to comply with the statutory requirement.

Under its present · offering, petitioner must register under the act.

AFFIRMED.

WILLIAMS, BERRY, BARNES and SIMMS, JJ., concur.

HODGES, C. J., LAVENDER, V. C. J., and IRWIN, J., dissent.

---

3. Ark.Stat.Ann. § 67–1248(b)(9) in pertinent part allows the described exemption if ". . . (B) no commission or other remuneration is paid or given directly or indirectly for soliciting any prospective buyer in this State['s] . . . .."