Gerald C. ROTHER, Plaintiff,

v.

LA RENOVISTA ESTATES, INC., an Oklahoma corporation, Earl E. Meyer, David H. Ratliff and Larry L. Hodges, Defendants and Third Party Plaintiffs,

v.

Wanda Jean ROTHER, Third Party Defendant.

No. Civ. 83–206–R.

United States District Court, W.D. Oklahoma.

Sept. 24, 1984.

Guy W. Jackson, Gene A. Castleberry, Oklahoma City, Okl., for plaintiff.

Joe L. Heaton, Fuller, Tubb & Pomeroy, Oklahoma City, Okl., for defendants.

## ORDER

DAVID L. RUSSELL, District Judge.

The Defendants, La Renovista Estates, Inc., Earl E. Meyer, David H. Ratliff, and Larry L. Hodges, filed a Motion for Summary Judgment in response to the Plaintiff's Complaint, and a Motion for Partial Summary Judgment in response to the Plaintiff's Amended Complaint. The Court will consider these as one Motion for Sum-

mary Judgment. The Plaintiff has filed a Cross Motion for Partial Summary Judgment. The Court will first address that portion of Defendant's Motion for Summary Judgment directed to the Plaintiff's action under federal and state securities law violations.

The material facts necessary for a determination of whether the transactions between the parties involved a security under federal law and Colorado law are not in dispute. The Plaintiff, a Colorado resident, owned two parcels of land in Oklahoma, one in Cleveland County and one in Canadian County. On August 30, 1982, the Defendants entered into various agreements with the Plaintiff regarding these two parcels of land. The parties executed an Agreement under which the Plaintiff conveyed the parcel of land located in Cleveland County to the Defendants in return for a loan in the amount of $190,000.00. The Cleveland County parcel was designated as the "Security Property." The Agreement designated the Plaintiff's other parcel, located in Canadian County, as the "Development Property."

The Agreement included the following pertinent provisions. The Defendants would loan to the Plaintiff $190,000.00. They would secure this amount from American Heritage Bank and lend the funds to the Plaintiff on the same terms they received. The Plaintiff would convey the Security Property to the Defendants as security for the loan. The Defendants agreed to market the Security Property and apply the proceeds to the bank loan. The Development Property would be conveyed under the terms of a separate agreement. The Defendants would execute mortgages on both properties to the lending bank for security, and would obtain release of the mortgages upon total repayment of the bank loan. The Defendants would then reconvey the Security Property by warranty deed to the Plaintiff.

This Agreement was modified by all parties by subsequent Letter Agreement to prevent marketing of the Security Property for a period of 30 days following execution of the Agreement. If the Plaintiff paid the loan in full during this 30 day period, or, if within the 30 days he set a date certain for the closing of a sale of his assets sufficient to pay the loan, the Security Property would not be marketed.

The Plaintiff conveyed both parcels by Warranty Deed in accordance with the Agreement. The Security Property was not marketed, and, upon repayment of the loan, the Defendants reconveyed the Security Property to the Plaintiff.

In conjunction with the Agreement, the parties entered into a Sale Agreement regarding the Development Property. Under the terms of the Sale Agreement, the Plaintiff sold the Development Property to the Defendants for a base purchase price of $2,750.00 per acre for 85.6 acres, making the total base purchase price $235,400.00. The Sale Agreement reflected the Defendants' intention to develop and sell this property. Consequently, in addition to the base price, the Defendants agreed to pay 25% of their net profits to the Plaintiff. The Sale Agreement further required the Defendants to execute a Promissory Note in the principal amount of $235,400.00, payment of said note to be secured by a mortgage on the Development Property. The Plaintiff's mortgage would be inferior to the mortgage held by American Heritage Bank until the $190,000.00 loan was paid. Additionally the Plaintiff's mortgage would be inferior to any mortgage created by the Defendants for the purpose of acquiring development funds for the property.

The Sale Agreement was amended by subsequent Letter Agreement which provided that if the net profits were insufficient to pay the 9% interest provided by the Sale Agreement, the Defendants would not have to pay the interest out of their separate resources.

The Defendants executed the Promissory Note in compliance with the Sale Agreement, but the record indicates they did not execute the mortgage in favor of the Plaintiff.

■ The Plaintiff contends a security was involved because the transactions included one or more of the following: a note, evidence of indebtedness, participation in a profit sharing agreement, and an investment contract. The foregoing are some of the definitions of the term security given under relevant federal and state law.[1] However, the weight of the Plaintiff's argument is directed to the establishment of a security by virtue of an investment contract.

At the outset, the Court notes that a literal interpretation of the definitional sections is inappropriate. In *Marine Bank v. Weaver*, 455 U.S. 551, at 555, 102 S.Ct. 1220 at 1223, 71 L.Ed.2d 409 (1982), the Supreme Court stated:

> The definition of "security" in the Securities Exchange Act of 1934 is quite broad. The Act was adopted to restore investors' confidence in the financial markets, and the term "security" was meant to include "the many types of instruments that in our commercial world fall within the ordinary concept of a security"...: We have repeatedly held that the test " 'is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.' " (citations omitted)

The Plaintiff's arguments regarding the definitions "note, evidence of indebtedness, and participation in a profit sharing agreement" are cursory. In a conclusory fashion without supporting argument, the Plaintiff states that the note is of an investment character and is, therefore, a security. The Court, however, is persuaded that unless the underlying transaction is found to be an investment contract, the note does not take on an investment character. The Plaintiff's "evidence of indebt-

edness" argument is simply this: (1) a note was involved in the transaction (2) a note is evidence of indebtedness and, (3) therefore, the transaction involved a security. In light of the mandate that substance will control over form in the securities setting, this aspect of the Plaintiff's argument is without merit. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (mere fact that shares were denominated stock did not make them securities); *Vincent v. Moench*, 473 F.2d 430 (10th Cir.1973) ("[s]ubstance is exalted over form and emphasis is placed on economic reality"). The Plaintiff also contends, and it is undisputed, that he was going to receive a share of the Defendants' net profit under the Sale Agreement. However, the Supreme Court in *Marine Bank* specifically stated that a share of the profits alone is not sufficient to make an agreement a security. *Id.* 455 U.S. at 560, 102 S.Ct. at 1225.

■ As previously noted, the Plaintiff strenuously asserts the presence of an investment contract. The criteria for determining the existence of an investment contract were set forth in *SEC v. W.J. Howey, Inc.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). "An investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party ...." The crux of the debate in the present case, as well as in the various circuits,[2] centers on the meaning of "common enterprise." This Court has not been able to locate any language from the 10th Circuit Court of Appeals defining the phrase. However, this Court addressed the extent of "commonality" necessary to meet the requirements of a "common enter-

---

**1.** *See* 15 U.S.C. § 77b(1) (Supp.1984); Colo.Rev. Stat. § 11–51–102 (1983); Okla.Stat.Tit. 71 § 2 (1981). Amendments to the United States Code and the Colorado Revised Statutes did not alter the definitions under consideration.

**2.** *Compare Curran v. Merrill, Lynch, Pierce, Fenner and Smith*, 622 F.2d 216 (6th Cir.1980), *and*

*Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274 (7th Cir.), *cert. denied* 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1982), *with Brodt v. Bache*, 595 F.2d 459 (9th Cir.1978), *Walsh v. International Precious Metals Corp.*, 510 F.Supp. 867 (D.Utah 1981), *and Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225 (S.D.N.Y.1981).

prise" in *First National Bank & Trust Co. v. Thoele,* No. CIV 80–1308–R (W.D.Okla. Sept. 30, 1982). In *Thoele,* the Court held that an investment contract exists only where there are multiple investors and a pooling of their funds. This type of "commonality" is referred to as horizontal commonality.

In the present case there is only one alleged investor. Consequently, he could not have been involved in a common enterprise under this Court's definition of the term. The absence of a security is supported by the Supreme Court's decision in *Marine Bank.* Here, as in *Marine Bank,* the instruments do "not fall within the ordinary concept of a security," this was "a private transaction," and was "negotiated one-on-one by the parties." *Id.* 455 U.S. at 559, 560, 102 S.Ct. at 1225, 1226.

The Court finds that under federal law no security was involved in the transaction between the parties. Accordingly, Defendants' Motion for Summary Judgment is granted to the extent it relates to the Plaintiff's action brought under the federal securities law.

The Court further finds that no cause of action for securities law violations exists under Colorado law.

Colorado has expressly stated that a "substantive appraisal of the commercial realities" of each case is necessary to determine the existence of a security. *Lowery v. Ford Hill Investment Co.,* 192 Colo. 125, 130, 556 P.2d 1201, 1205 (1976). Accordingly, the Court finds that the Plaintiff's literalism argument, relying merely on the presence of a note, evidence of indebtedness or participation in a profit sharing agreement, would be ineffective under Colorado law. Nor can the Plaintiff prevail on these facts under an investment contract theory as the Colorado Supreme Court has determined that horizontal commonality is a prerequisite to the establishment of an investment contract. *Raymond Lee Organization v. Division of Securities,* 192 Colo. 112, 556 P.2d 1209 (1976). Accordingly, Defendants' Motion for Summary Judgment is granted to the

extent it relates to Plaintiff's cause of action for securities violations under Colorado law.

■ With regard to Oklahoma law, § 501 of the Oklahoma Securities Act states: "This act shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this act with the related federal regulation."

In light of this language, Oklahoma has determined it must look to other jurisdictions to interpret the meaning of the statutory language. *State v. Hoephner,* 574 P.2d 1079 (Okl.Cr.1978). The Court in *Hoephner* stated: " '[I]n searching for the meaning and scope of the word "security" in the [Securities Exchange] Act [of 1934], form should be disregarded for substance and the emphasis should be on economic reality.' " *Id.* at 1081 (quoting *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). The Court also adopted various criteria to be used in determining whether a note is of a commercial or investment nature inasmuch as "the phrase 'any note' does not really mean any note." *Id.* at 1081. Without reciting these numerous guidelines here, this Court finds that under Oklahoma law the Plaintiff would be unable to show the existence of a security on the mere basis that the transactions included a note and evidence of indebtedness.

Although Oklahoma has not determined the requisite "commonality" for an investment contract, the *Hoephner* Court cited with approval the United States Supreme Court decision in *Howey.* This Court is persuaded that Oklahoma courts would again look to federal and state case law and conclude that horizontal commonality is required. *See Raymond Lee Organization,* 556 P.2d 1209; cf. *Marine Bank,* 455 U.S. 551, 102 S.Ct. 1220. Based on the same rationale, the Court concludes that Oklahoma would find a security could not be established solely on the basis of participation in a profit sharing agreement. *See*

*Marine Bank,* 455 U.S. at 560, 102 S.Ct. at 1225.

The Plaintiff advances a final theory to support the finding of a security under Oklahoma law, and moves for partial summary judgment on Okla.Stat. tit. 71 § 2(20)(P). Subsection (20)(P) states:

(20) "Security" means any:

. . . .

(P) investment of money or money's worth including goods furnished and/or services performed in the risk capital of a venture with the expectation of some benefit to the investor where the investor has no direct control over the investment or policy decision of the venture;

The Oklahoma Supreme Court has stated that this codification is a modification of the definition of investment contract given in *Howey. State ex rel Day v. Petco Oil & Gas, Inc.,* 558 P.2d 1163 (Okla.1977). However, the Court does not attempt to reveal the extent of the modification. The "common enterprise" language of *Howey* is obviously absent, and this Court is reluctant to speculate on whether the Oklahoma legislature intended to thereby avoid the entire requisite "commonality" issue.

Without a horizontal commonality requirement read into the statute, the Court finds that it is without sufficient information to determine whether the Plaintiff placed his capital [land] at risk. In that regard, the Court is aware of the fact that a promissory note, executed by La Renovista, as well as Meyer, Ratliff and Hodges, in their individual capacity, secured $235,-400.00 of the Plaintiff's capital. However, the Court is unaware of the fair market value of the land at the time of the transaction. If the fair market value of the land is in excess of the amount secured by the note, then such excess might be considered capital at risk. The parties have not agreed on the fair market value of the land at the time of the transaction, consequently the issue of whether a security exists is not an appropriate one for summary judgment.

■ The Defendants contend that should the Court find a security under Oklahoma law, such security is exempt from registration by virtue of Okla.Stat. tit. 71 § 401(b)(5):

Any transaction in a bond or other evidence of indebtedness secured by a real or chattel mortgage or deed of trust, or by an agreement for the sale of real estate or chattels, if the entire mortgage, deed of trust, or agreement, together with all the bonds or other evidences of indebtedness secured thereby, is offered and sold as a unit;

It is unchallenged that no mortgage was executed by the Defendants to the Plaintiff thereby securing the note with the real estate involved. Additionally, the Plaintiff makes a very credible argument that this exemption was extended to cover certain "upstream" sales of completed transactions and is not appropriate under the facts of the present case. Under either theory, the Court is persuaded this exemption is unavailable to the Defendants if a security is present under Oklahoma law.

As the Court is without sufficient information to determine the existence of a security under Oklahoma law, it denies the Plaintiff's Motion for Partial Summary Judgment and the Defendants' Motion for Summary Judgment on this issue.

■ The Plaintiff's Amended Complaint alleges a cause of action arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* [RICO]. Section 1964 of the Act permits "any person injured in his business or property by reason of a violation of section 1962 of this chapter [to] sue therefor in any appropriate United States district court . . . ." The Plaintiff's Amended Complaint alleges he suffered such an injury from the Defendants' violation of § 1962(c) and (d). Those subsections provide:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

The Plaintiff alleges that Meyer, Ratliff, and Hodges, the sole stockholders of La Renovista, facilitated La Renovista's purchase of the Development Property by misrepresentation. This misrepresentation was accomplished in part by means of wire communications and the U.S. mail, purportedly bringing the Defendants' acts within the definition of "racketeering activity" [mail and wire fraud] and "pattern of racketeering activity" [at least two acts of racketeering activity] under § 1961.

■ There is considerable debate over whether a private litigant suing under RICO must sustain an injury separate from the injury received from the predicate acts themselves.[3] The Tenth Circuit has not yet addressed this issue. This Court, however, is persuaded by the recent Second Circuit opinion in *Bankers Trust Co. v. Rhoades*, 741 F.2d 511 (2nd Cir.1984), that such an injury is a prerequisite to sustaining a private RICO claim.

In *Bankers Trust Co.*, the Court relied on statutory language and an analysis of legislative history[4] in finding that a distinct injury resulting from the use of a pattern was required. The Court stated:

The requirement that the injury be "by reason of" a violation of § 1962 means that there must be a causal connection between the prohibited conduct and the plaintiff's proprietary injury. Thus, it is insufficient for a plaintiff to prove simply a violation by the defendants and a proprietary injury; it must prove that the defendants' violation caused the injury....

Section 1964(c) does not provide a private right of recovery unless the conduct that caused the injury was "a violation of section 1962." We must therefore ask what conduct violates that section. Although, as detailed above, § 1962 has a number of facets, it is clear that it does not itself prohibit the predicate acts that constitute racketeering activity. Commission of two or more predicate acts is but an element of a § 1962 violation; those acts do not themselves constitute the § 1962 violation. Indeed, § 1962 does not even prohibit a pattern of racketeering activity, without more. Rather, there is a violation of § 1962 only if there are present both (1) the pattern or racketeering activity, and (2) the use of that pattern to invest in, control, or conduct, a RICO enterprise. It is this confluence that must cause the proprietary injury.

The import of this analysis is that if a complaint alleges a proprietary injury that is caused by the defendant's predicate acts, rather than by its use of a pattern of racketeering activity in connection with a RICO enterprise, the injury cannot be said to have been caused by "a violation of section 1962."

*Id.* at 516.

The Court went on to provide examples of the type of injury which occurs when a

---

**3.** *Compare Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982) *Reh'g en banc granted*, 710 F.2d 1361 (1982), *with Bankers Trust Co. v. Rhoades*, 741 F.2d 511 (2nd Cir.1984) *affirming Bankers Trust Co. v. Feldesman*, 566 F.Supp. 1235 (S.D.N.Y. 1983).

**4.** The Court cites *Sedima, S.P.R.L. v. Imrex Company, Inc.*, 741 F.2d 482 (2nd Cir.1984), a case considered contemporaneously with *Bankers Trust Co.*, as containing a detailed examination of legislative history.

The *Sedima* Court concluded:

The most important and evident conclusion to be drawn from the legislative history is that the Congress was not aware of the possible implications of section 1964(c). If Congress had intended to provide a federal forum for plaintiffs for so many common law wrongs, it would at least have discussed it. If Congress had intended to provide an alternate and more attractive scheme for private parties to remedy violations of the securities laws—involving decades of statutes, regulations, commentaries, and jurisprudence—it would at least have mentioned it. The House Judiciary Committee, which authored the provision, would at least have mentioned the amendment to the full House as a major change in its report had there been any inkling of its possible implications.

*Id.* at 492.

plaintiff is injured by the pattern as opposed to the acts:

[A] plaintiff who is victimized by a defendant enterprise's multiple acts of arson may thereafter be denied fire insurance as a result of his fire history; such a plaintiff whose property subsequently suffers innocent fire damage would be unable to obtain reimbursement for the damage, and his monetary loss would be the result of the pattern of predicate acts of the enterprise, rather than any of the individual acts. Or, a plaintiff might be forced to incur an unwanted debt or to take on an unwanted business partner because an enterprise has placed his business in jeopardy by using felonious means to cause a number of his customers to withhold their custom. In each instance, the plaintiff would have suffered an injury to his business or property by reason of the defendants' use of a RICO enterprise and a pattern of racketeering acts; the individual racketeering acts, however, could not be said to have caused the same injury.

*Id.* at 517.

The predicate acts alleged by the Plaintiff under RICO are identical to those giving rise to his common law fraud action. Indeed, the Plaintiff's Amended Complaint expressly states his RICO action is pled as an alternative to his common law fraud action. He alleges no separate injury arising solely from the pattern as opposed to the underlying acts, nor has any been brought to the Court's attention through affidavits or the subsequent briefing. Consequently, there being no dispute as to the material facts, the Court finds the Defendants are entitled to judgment as a matter of law on the Plaintiff's cause of action under RICO.

■ The Plaintiff alleges a common law misrepresentation action against the Defendants contending they induced the Plaintiff to use the Defendants as a conduit through which to borrow funds. The Court is persuaded that material facts are in dispute, and, therefore, denies the Defend-

ants' Motion for Summary Judgment in that regard.

■ Finally, the Plaintiff alleges a cause of action solely against Defendant Meyer for misrepresentation occurring in 1978 while a confidential agency relationship existed between the Plaintiff and Meyer.

The Plaintiff contends Meyer showed him the Development Property in November 1976, and encouraged him to buy it as an investment. Allegedly, Meyer agreed to act as the Plaintiff's agent for the purchase of the property when, in fact, Meyer was a seller of the property. The Plaintiff states he thought he had purchased the property from the occupant, and was not aware he had purchased the property from Meyer, and others, until after this action was filed.

■ In Oklahoma, an action for fraud must be filed within two years of the discovery of the fraud or from such time as the fraud could have been discovered by ordinary diligence. *In re Woodward,* 549 P.2d 1207 (1976); Okla.Stat. tit. 12 § 95 Third (1981). Where a confidential relationship exists between the parties at the time of the fraud, the statute is tolled until the defrauded party has actual notice of the fraud. *Thomas v. Wilson,* 199 Okl. 308, 185 P.2d 473 (1947).

Without the existence of a confidential agency relationship, the Plaintiff would be held to notice by the filing of the deed, and the statute would bar this action. *In re Woodward,* 549 P.2d 1207 (1976). However, the Court finds that material facts regarding the issue of agency are in dispute and denies Defendant Meyer's Motion for Summary Judgment.

In summation, the Defendants' Motion for Summary Judgment is granted on the following: (1) alleged violations of the federal securities law and Colorado securities law, and (2) alleged violation of RICO. The Defendants' Motion for Summary Judgment is denied on the following: (1) action for failure to register a security in Oklahoma, (2) action for misrepresentation arising under Oklahoma securities law, and (3)

action for common law fraud against the Defendants. Defendant Meyer's Motion for Summary Judgment is denied, and the Plaintiff's Motion for Partial Summary Judgment is also denied.